

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER GRAHAM, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 05 C 994 ) |
| CINGULAR WIRELESS, LLC, | ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

This action is brought under Title VII of the Civil Rights Act of 1964 by Christopher Graham ("Graham") against his employer, Cingular Wireless, LLC ("Cingular"). Graham has brought race discrimination, retaliation and hostile work environment claims against Cingular, and Cingular has now moved for summary judgment. For the following reasons, I grant Cingular's motion.

I.

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999); Fed. R. Civ. P. 56(c). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Evidence presented in opposition to a motion for summary judgment must be admissible in content, though it need not be in an admissible form. *Payne v. Pauley*, 337 F.3d 767, 775 n. 3 (7th Cir. 2003) (citing *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002)). *See also Juarez v. Menard, Inc.*, 366 F.3d 479, 484 n.4 (7th Cir. 2004) (noting that affidavits submitted in opposition to summary judgment must be based on personal knowledge such that they would be admissible at trial). This requirement is at issue in this case because Graham has submitted an affidavit which contains much information that is either outside his personal knowledge, reliant on hearsay, or is speculative or unsupported opinion. Cingular has moved to strike Graham's affidavit. While I will not strike the affidavit in its entirety, I cannot consider those portions of the affidavit that would not be admissible testimony at trial.[1]

Cingular has also moved to strike Graham's response to its Local Rule 56.1(a)(3) statement of undisputed facts. Some of Graham's responses to particular facts within that statement do not conform to Local Rule 56.1(b)(3) because they do not contain specific references to affidavits, parts of the record, or other

---

[1] Cingular's motion to strike also argues that the exhibits attached to Graham's affidavit should be disregarded because they are not sworn and lack foundation as required by Fed. R. Civ. P. 56(e). However, in his affidavit Graham does lay foundation for these exhibits, and so to the extent they are admissible and are relevant to this case I will consider them.

supporting materials.[2] Responses that do not comply with Local Rule 56.1(b)(3) make it difficult for this court to evaluate whether there are true disputes of material fact and what evidence the non-moving party could actually present at trial to support his claims. Despite the difficulties that the non-compliant portions of Graham's responses create, I will not strike his responses in their entirety. Instead, I will not consider the portions of his responses that do not comport with the local rules.

## II.

From reviewing the pleadings and submissions of both parties, the undisputed facts are as follows: Graham is employed as a wireless technician with Cingular, and has been employed by Cingular or its predecessor companies since 1993. His current department maintains Cingular's Chicago-area cellular market. Graham and Cingular's other wireless technicians are members of the Communications Workers of America union ("CWA"). In the last few years, several incidents have occurred within Cingular that Graham believes violated his rights. In 2003, Graham filed a charge with the Equal Employment Opportunity Commission ("EEOC") (the "2003 charge") alleging that he was retaliated and discriminated against by being denied overtime, receiving an unwarranted poor performance review, and being subjected to harassment from co-workers and

---

[2]See, for example, Graham's responses to Cingular's statements of fact nos. 4, 24, 30, 34, 39, 43, 53, 57-62, 64-70, 73, 75-77, 80, 84, 86-87, 91, 93, 98-194, 106-07, 109-10, 115-18, and 121.

management.[3] After receiving a right to sue letter, plaintiff, along with another co-worker and two Cingular dealers, filed a federal lawsuit. The lawsuit was based in part on Graham's 2003 charge and alleged that Graham was retaliated and discriminated against based on his race. That lawsuit was dismissed as to Cingular and Graham in March of 2004.[4]

In November of 2004, Graham filed another EEOC charge (the "2004 charge") in which he alleged that he was retaliated against for filing his 2003 charge by receiving a "derogatory" performance evaluation, being told by a co-worker that a manager made a racist comment, being directed to "copy all of [his] e-mails and send them to [his] direct manager and work group," having a "built by Irish crew" sign placed in an area in which he worked, being denied his request to have a union representative present during a meeting concerning his evaluation, and having "false and defamatory"

---

[3]The retaliation claim related to an earlier EEOC charge Graham filed in April of 2002, alleging he was discriminated against, based on his race, in promotions, training, and bonuses. The EEOC issued a right to sue letter but Graham did not file a lawsuit based on this charge.

[4]Graham and Cingular disagree as to whether this dismissal was with prejudice. Nothing in the court's order specifically states that the dismissal was with prejudice. See Graham, et al. v. Cingular Wireless, Inc., et al., Docket Entry at 1 (N.D. Ill. March 19, 2004) (Norgle, J.). The Seventh Circuit dismissed Graham's appeal of that dismissal on September 14, 2005. See Graham, et al. v. Cingular Wireless, Inc., Order at 1 (7th Cir. Sept. 14, 2004).

4

statements made about him to his personal injury attorney. That same month the EEOC issued a right to sue letter on that charge.

In February of 2005, Graham filed his initial complaint in this case, alleging Cingular discriminated and retaliated against him for his previous lawsuit. After certain of the claims in his initial complaint were dismissed, Graham filed another charge with the EEOC (the "2005 charge") in which he alleged additional acts of discrimination and retaliation by Cingular in 2004 and 2005. Shortly thereafter he received a right to sue letter from the EEOC. Graham then filed an amended complaint that included retaliation and race discrimination claims against Cingular based on the acts alleged in his 2005 charge. After Cingular filed a motion to dismiss, this court concluded that, with respect to his race discrimination claims, only those that were within 300 days of his 2005 charge could be brought in this lawsuit. See *Graham v. Cingular Wireless*, No. 05 C 994, Order at 1 (N.D. Ill. March 6, 2006).

The parties agree that Graham now has a race discrimination claim and a retaliation claim remaining. Graham alleges that Cingular discriminated against him based on his race: (1) by requiring Graham to email his superiors and coworkers about his job progress throughout the day; (2) through co-worker Larry Barrett ("Barrett"), who emailed Graham in 2005 to ask him to stop sending numerous emails throughout the day; (3) by requiring Graham to

5

follow "strict instructions" from his supervisors; (4) by denying Graham his request to receive earlier technology training early due to his seniority as required by the union's agreement with Cingular; and (5) by being denied receipt of a laptop mount and a cellular telephone in a timely fashion.[5]

Graham alleges that each of these incidents also constituted retaliation against him for the filing of his 2003 charge and his earlier lawsuit. In addition, Graham alleges that Cingular further retaliated against him: (1) by giving him a "derogatory performance evaluation in 2004; (2) through co-worker Daniel Delaney ("Delaney"), who emailed Graham in 2004 to ask him to stop sending

---

[5]There is a factual dispute between the parties as to the accuracy of each of these claims. Graham testified in his deposition and his affidavit that his supervisors gave him oral instructions during two separate meetings to email his supervisors and coworkers about his job progress throughout the day; Cingular's witnesses testified that no such requirement was ever placed on Graham. Barrett testified that he only "asked" Graham to stop emailing him so frequently, but Graham testified that this was a directive, in part because Barrett is a high-ranking member of Graham's union. Graham's claim concerning "strict instructions" that his supervisors required him to follow is vague, but he and Cingular's witnesses dispute whether he was supervised differently than other co-workers. With respect to training, Cingular's witnesses testified that it was not required to and did not normally schedule technical training according to seniority. Witnesses testified that plaintiff eventually received the training before at least one employee with more seniority. Graham testified that this training should have been scheduled with regard to seniority and that he was disadvantaged by receiving it later. Finally, Graham's supervisor testified that he provided Graham with a laptop mount and phone as quickly as he was able, although it took slightly longer than Graham wanted. Graham, by contrast, testified that his supervisor could have ordered the equipment more quickly but chose to delay.

6

him copies of his emails at the end of the day; (3) through union steward and co-worker Michael Morrissey ("Morrissey"), who emailed Graham and all other union members in 2003 to tell them that "ratting people out" could result in dismissal from the union or from Cingular;[6] (4) through Jim Gurga ("Gurga"), a manager-level Cingular employee from another department who told Graham's co-worker that the co-worker might be suspected of vandalism because he "had a tan;" (5) through Morrissey, who placed a sticker with the words "built by Irish crew" at a cellular site located in Graham's work zone; (6) by denying Graham's request to have a union representative present when he met with his supervisor regarding his "derogatory" performance review; and (7) through a Cingular attorney who made a "false and defamatory" statement about Graham in a settlement letter sent to Graham's personal injury attorney.[7] Graham also generally alleged in his complaint that all these incidents created a hostile work environment for him. For the

---

[6]Allegations concerning this email were not a part of Graham's EEOC charge, and any charge relating to this email would have been outside the 300 day time limit for bringing a charge since the email was sent on November 18, 2003, and Graham's next EEOC charge was filed in November of 2004. 42 U.S.C.A. § 2000e-5(e)(1) (2006). For that reason, Cingular argues it should be dismissed as time-barred. I agree, although even assuming it were not time-barred, it cannot support a claim for retaliation for other reasons.

[7]There is also a factual dispute between the parties as to what occurred with respect to some of Graham's retaliation claims.

7

reasons set forth in this opinion, I find that summary judgment as to each of these claims is appropriate for Cingular.

III.

I first address Graham's racial discrimination claims. An initial question is whether Graham can proceed under the direct method of proof or whether Graham must rely on the indirect method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Graham has presented no direct evidence that any of the actions described above were taken specifically to discriminate against Graham because of his race, and here there is no "'convincing mosaic' of circumstantial evidence" that would suggest the inference of intentional discrimination by a decision-maker. *See Jordan v. City of Gary, Indiana*, 396 F.3d 825, 832 (7th Cir. 2005) (citing *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Therefore, he must proceed under the indirect method of proof. To establish a prima facie case under that method, Graham must show: 1) that he is a member of a protected class; 2) he was performing his job satisfactorily; 3) he suffered an adverse employment action; and 4) Cingular treated similarly-situated employees outside of Graham's class more favorably. *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). If he can establish this is the case, then Cingular must provide a legitimate, non-discriminatory explanation for the actions it took with respect to

Graham. *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003). If Cingular can do so, then it is Graham's burden to show that Cingular's stated reason was pretextual. *Id.*

Cingular contends that Graham cannot meet the third or fourth prongs of this test.[8] I agree that Graham cannot show that any of the alleged instances of racial discrimination were accompanied by or constituted an adverse employment action. An adverse employment action requires a "significant change[] in employment status." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). *See also Rhodes*, 359 F.3d at 504 (citing *Crady v. Liberty Nat'l Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)) (holding that a "materially adverse employment action is something 'more disruptive than a mere inconvenience or an alteration of job responsibilities'"). None of the incidents that Graham points to in his lawsuit constitute adverse employment actions. They did not change the terms of Graham's employment, and Graham has not alleged that these incidents were accompanied by some other change in employment terms. Graham admits that, other than his performance evaluations, Cingular has never disciplined, reprimanded, or suspended him.[9]

---

[8] There is no dispute here that Graham is African-American, thus satisfying the first prong, and Cingular does not argue that Graham was not performing his job satisfactorily.

[9] Graham also stated in his deposition that he has never applied for a promotion while at Cingular because he has "been stuck in this position" and was "afraid that [he] might be fired"

9

Likewise, even considering the evidence in the light most favorable to Graham, he cannot show that Cingular has treated similarly-situated employees outside of his class more favorably. To show that another employee is similarly situated to him, Graham must show that "there is someone who is directly comparable to [him] in all material respects." *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). "[A] court must look at all relevant factors." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). Assuming, as Graham does, that the conduct of which he complains was disciplinary in nature, Graham must show that another employee who is similarly situated to Graham "with respect to performance, qualifications, and conduct" was treated differently. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (citing *Radue*, 219 F.3d at 617). Here, even taking the facts in the light most favorable to Graham, he has made no such showing. Graham contends in his affidavit that white employees were not required to email their supervisors and coworkers about their job progress throughout the day and were not monitored as strictly as he was, but he presents no evidence of this. He states in his affidavit, without support, that a particular employee was not reprimanded for traveling to worksites

---

if he left his current position for one where he was not "somewhat protected by the union." He has presented no evidence from which a finder of fact could conclude that he has been denied a promotion, however.

10

alone in violation of Cingular's rules, but he provides no evidence that this employee was similarly situated to him. Likewise, Graham admits that after he complained to Barrett about his email, Barrett sent a similar email to the rest of the department asking that they do the same.[10] Other than stating in his affidavit that it is "normal practice" for Cingular to schedule training by seniority, Graham has presented no evidence of similarly-situated employees who were offered training earlier than he was, and a Cingular employee responsible for the technology training of which Graham has complained testified that other employees with more seniority than Graham received the training after Graham. Finally, Graham eventually received both the laptop mount and the cellular phone he requested, and while he has identified other white employees who received these items, he has provided no evidence that any similarly-situated employee received these items more quickly than he did.[11]

---

[10]Further, Barrett stated in an affidavit that he previously sent a similar email to Delaney, a white co-worker, requesting that Delaney send fewer emails to him. Cingular has not produced a copy of this email.

[11]Graham does allege (without evidentiary support) that other white co-workers with less seniority than he were given newer cell phones before he was, but he does not provide any evidence it took these employees less time to receive these cell phones, or that these employees had the same duties or were otherwise similarly-situated to him.

11

Because, even taking the evidence in the light most favorable to him, Graham cannot show that he suffered either an adverse employment action or that a similarly-situated employee was treated differently than he was, his race discrimination claim cannot survive summary judgment.

IV.

I next consider Graham's retaliation claim. The test for Graham's retaliation claim is similar to the test for discrimination; he must show that (1) after lodging a complaint about discrimination, (2) he, and not otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner. *Whittaker v. Northern Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) (citation omitted). For the reasons discussed above, the incidents that Graham points to as subjecting him to discrimination likewise do not establish a retaliation claim because Graham has not shown that he was subjected to an adverse employment action. In addition, the other incidents that Graham argues establish retaliation do not meet either of these requirements. The Seventh Circuit has previously held that although "negative performance evaluations may be evidence of discrimination, they are not alone considered to be actionable adverse employment actions." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 862 (7th Cir. 2005) (citing *Haywood v. Lucent*

*Techs, Inc.*, 323 F.3d 524, 532 (7th Cir. 2003)).[12] As discussed above, none of these incidents changed Graham's employment status in any way whatsoever. For this reason, it is not necessary to analyze whether, taking the facts in the light most favorable to Graham, Graham can satisfy any of the other elements of a claim for retaliation.

V.

Graham's race discrimination and retaliation claims are better categorized as a hostile environment claim. Graham did allege in his amended complaint that he was subjected to a hostile work environment, with the specific incidents of which he complains as purported evidence of that hostile environment. For his hostile work environment claim to survive summary judgement, Graham must show (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was so severe or pervasive as to alter the conditions of his work environment by creating a hostile or abusive situation; and (4) there is a basis for Cingular's liability. *Smith v. Northeastern Illinois Univ.*, 388 F.3d 559, 566 (7th Cir. 2004). In evaluating the severity and pervasiveness of conduct, I should consider "all the circumstances, including the frequency of the discriminatory conduct; its

---

[12]Graham argues that this performance review constituted "discipline" which might be viewed as an adverse employment action. Regardless of how the review is defined, however, Graham has presented no evidence that the review led to any change in his employment status whatsoever.

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Russell v. Bd. of Trs. of Univ. of Illinois at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001)). The environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002).

Of all the incidents of which Graham complains, only some could even be seen as "harassment," and taken together as a whole they were not so severe and pervasive as to alter Graham's conditions of employment. The emails Delaney and Barrett sent requesting Graham limit the amount of email he sent per day cannot be seen as either independently harassing or as part of a campaign of harassment.[13] Likewise, the letter that Cingular's attorney sent

---

[13]The email from Barrett, which was sent only to Graham, stated:

> With all the E-mails we receive throughout the day, why must you send everyone the status of each site? This information could be sent in one lump sum if you believe it is important. I for one don't need to see this [sic] our supervisor and systems should get it.

Graham makes the unsupported allegation in his affidavit and response to Cingular's statement of facts that Barrett was a person with authority within the union and therefore could control personnel decisions within Cingular, but without supporting evidence that this is the case I cannot consider Barrett to have any status other than Graham's co-worker.

The email from Delaney, on which Graham's department was

14

to Graham's attorney which accurately pointed out that a lawsuit Graham filed had recently been dismissed was not "harassment" but rather an attempt by Cingular to reach a settlement with Graham about his numerous complaints. A reasonable person would not view these occurrences as hostile or abusive. *Cerros*, 288 F.3d at 1045.

The remaining incidents can be divided into two categories: incidents in which Graham's supervisors allegedly harassed him (by giving him a derogatory performance evaluation, not allowing him to have a union representative join a meeting about that evaluation, requiring him to email superiors and coworkers about job progress, requiring him to follow "strict instructions," and by denying his requests for training and equipment), and incidents in which Graham's co-workers harassed him (through the email sent to union members warning against "ratting" each other out; the statement made by the manager-level Cingular employee; and the "built by Irish crew" sign).

Those actions taken by his supervisors are all seemingly race-neutral, so Graham must show that they are "sufficiently connected to race" in order to show that they were based on his race. *See Beamon*, 411 F.3d at 863-64. Here, even taking the facts in the

---

carbon copied, stated:

> Chris, can you send out one email at the end of the day for the sites you have completed? Thanks. . . Its [sic] help keeps the mail box down to a minimum, with all the santos email now . . . its [sic] gets kinda crazy. . .

15

light most favorable to Graham there is no evidence that these actions were based on his race. Graham attempts to impute a racial motive on his supervisors by providing an unsupported account in his affidavit about an incident in which one of his supervisors became angry upon seeing a picture showing the supervisor's head superimposed onto a picture of an African-American character from the television show "Sanford and Son." Even if this unsupported account were true (and even assuming Graham is qualified to testify about how his supervisor felt about this picture, which he is not) this alone is not enough to provide a racial motive for any of the actions taken by his supervisors. Likewise, Graham states (without any support) that another of his supervisors deliberately assigned him to a high-crime work location on the south side of Chicago, but this also does not provide sufficient evidence of a racial motive.

Taking the facts in the light most favorable to Graham, the incidents involving the behavior of Graham's co-workers and non-supervisors are less race-neutral.[14] Morrissey's "built by Irish crew" sign and Gurga's comment about a co-worker's tan are more race-specific and potentially were motivated by race. However, neither Morrissey nor Gurga supervised Graham. Even assuming that

---

[14]There is little evidence that the email Morrissey sent that warned against "ratting" out co-workers was motivated by race, and regardless, Graham does not allege that it was, instead arguing that the email was to retaliate against him for filing a claim against Cingular. That Morrissey was involved in the "built by Irish crew" sign is not enough to suggest this email was motivated by race.

Graham could show all the other elements for a hostile work environment based on these statements,[15] Cingular would still have an affirmative defense for these acts if it could show that (a) it exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that Graham unreasonably failed to take advantage of any preventive or corrective opportunities provided by Cingular. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (setting out this defense in the context of a sexual harassment claim). In this case it is not disputed that Cingular has a written equal employment policy and provides training to employees which covers its anti-discrimination and anti-harassment policy. Cingular also has an ethics hotline and its human resources department investigates claims of discrimination and harassment. It is undisputed that Graham was aware of these resources; he made several complaints to the human resources department which were investigated.[16] Graham complained about the

---

[15] These statements, in and of themselves, do not establish a hostile work environment. Neither of these statements were made directly to Graham; he saw the sign at a Cingular worksite and heard about the tan comment from a co-worker. The Seventh Circuit has previously held that "second-hand harassment" has a lesser impact than harassment directed at a plaintiff, such that it is more difficult to establish a hostile work environment claim based on such statements. *See, e.g., Smith*, 388 F.3d at 566-67 (finding no hostile work environment where plaintiff was informed by her clerical staff that another employee used a racial epithet in referring to her on several occasions).

[16] Graham complained to Cingular's human resources department about both his performance review and the "built by Irish crew" sign. In both cases the incidents were investigated and some

17

"built by Irish crew sign" to Cingular's human resources department. The sign was removed either "immediately" or within the next day or two, according to different information within the record. A Cingular supervisor stated in his deposition that Morrissey was reprimanded for the incident.[17] Likewise, Graham has presented no evidence that he or anyone else ever complained to Cingular about Gurga's "tan" comment.[18] Other incidents of which Graham complains also went unreported.[19] Therefore, there is no basis for Cingular's liability for any of the incidents of which Graham complains. *See Williams v. Waste Mgmt. of Illinois, Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004) (finding no basis for employer

---

action was taken. Graham does not dispute that these complaints were investigated but does dispute whether Cingular took appropriate action in response.

[17]In his response to Cingular's statement of facts Graham contests, without support, that the employee was not reprimanded.

[18]Graham contests in his response to Cingular's statement of facts that this statement went unreported, saying that "plaintiff confirmed the incident" in "the email made to Human Resources." However, Graham does not specifically cite to such an email, and as far as the court can determine no such email is attached anywhere to Graham's affidavit or response to Cingular's statement of facts. In Graham's affidavit he does not specifically state that he complained about this statement. Therefore, there is no dispute of material fact that this statement went unreported.

[19]Graham presents no evidence (or even an allegation) that he complained to the human resources department or the ethics hotline about the order in which he received technical training, the time it took for him to receive equipment, or Morrissey's email about "ratting out" fellow employees. He did complain about the emails Barrett and Delaney sent requesting he limit the number of emails that he sent; Cingular's human resources department determined that those emails were not improper.

liability where employer took action after receiving complaint even though "the investigation was by no means textbook in its execution" and "may have been imperfect"). *See also Berry v. Delta Airlines, Inc.*, 260 F.3d 801, 811 (7th Cir. 2001) ("If an employer takes reasonable steps to discover and rectify the harassment of its employees . . . it has discharged its legal duty.") (citation omitted). For these reasons, even considering the facts in the light most favorable to Graham, any hostile work environment Graham may have must fail.

VI.

Because Graham cannot establish a *prima facie* case of retaliation, race discrimination, or hostile work environment, I need not go further and consider whether Cingular has provided a legitimate, non-discriminatory explanation for its actions, and whether Graham can show that these reasons were pretextual. Considering the facts in the light most favorable to Graham, Graham cannot show that Cingular has violated Title VII, and I grant Cingular's motion for summary judgment.

**ENTER ORDER:**

*Elaine E. Bucklo*

**Elaine E. Bucklo**
United States District Judge

Dated: June 21, 2006